IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF PUERTO RICO

FILED & ENTERED

1 3 AUG 2008

CLERK
U.S. BANKRUPTCY COURT
SAN JUAN, PUERTO RICO

IN THE MATTER OF                      :
ALMACENES LINDA, INC,                 :    CASES CONSOLIDATED UNDER
                                      :         NO.07-00130(SEK)
   DEBTOR IN POSSESSION                :    CHAPTER 11
-----------------------------------------------------------------
IN THE MATTER OF                      :
SAUL KLEIMAN KATZ,                    :    CASE NUMBER 07-02609(SEK)
   DEBTOR IN POSSESSION                :    Chapter 11
-----------------------------------------------------------------

## OPINION AND ORDER

Banco Bilbao Vizcaya Argentaria ("BBVA"), asks us to reconsider our order given in open court, finding its section 1111(b)[1] election and the issue of the collateral's inconsequential value moot, as Almacenes Linda, Inc. (the "Debtor") amended its treatment of BBVA's claim contained in its second amended plan of reorganization, now stating it would pay the net cash value of the insurance policy serving as collateral for its loan with BBVA on the effective date of the plan, treat the claim's deficiency or recourse claim under Class six and cancel[2] or surrender it, as this asset is not needed for Debtors



---

[1] "An unsecured creditor, a creditor whose security is worth less than the total amount owed to the creditor, may choose to have its claim treated in two manners. First, it can have a bifurcated claim, with a secured claim to the extent of the value of its collateral, and an unsecured claim for the remainder of the debt owed. 11 U.S.C. § 506(a). **Second, the secured creditor can waive its unsecured claim and elect to have its total claim treated as secured. 11 U.S.C. § 1111(b)(2)."** (Our emphasis) (cit. omitted). *In re Griffiths*, 27 B.R. 873 (Bkrtcy. Kan. 1983).

[2] Debtors preferred to cancel the policy if allowed to do so under the terms of the assignment and applicable non

effective reorganization.

Relying on *In re Century Glove, Inc.*[3], BBVA argues that the surrender of the collateral following an 1111(b) election does not satisfy its claim, nor make the election moot. It then asks the court to look at the treatment of its claim under the first amended plan filed, before the election. It claims that payment under that plan, of the net cash value of in 120 equal consecutive monthly installments, does not meet the criteria set by § 1111(b)(2) and therefore, that plan cannot be confirmed under the cram down provisions of Code Section 1129 (b)(2)(A)(iii)[4].

The underlying critical question is how much Debtors will have to pay given BBVA's § 1111(b) election. We are not surprised that the parties interpret the consequences of the election differently, as practitioners and commentators are dismayed over the ramifications of such an election.[5]

Because we do not agree with the Bank's interpretation of



---

bankruptcy law.

[3] *In re Century Glove, Inc.*, 74 B.R. 958 (Bkrtcy. Del. 1987).

[4] "There can be a cash payment cram down, requiring the debtor to make cash payments of at least the allowed amount of the claim, and the discount value of these payments must equal at least the value of the collateral." *In re Century Glove, Inc.*, 74 B.R. at 876.

[5] See 58 Am. Bankr. L.J. 129 n. 4 (1984).

2

the cited case, we deny BBVA's motion.

We begin by narrating events preceding our decision. In February 2007, the Bank filed a proof of claim in the case of Almacenes Linda, Inc. for the sum of $3,017,653.12, of which $144,919.40 were secured by an assignment of a life insurance policy attached thereto. The remaining amount was classified as a general unsecured debt. Debtor did not object, and the claim was deemed allowed as filed under 11 U.S.C. § 502(a).

In December 12, 2007, the Debtors in possession ("Debtors") filed a joint amended plan of reorganization. BBVA's claim was treated under Class eight as secured for the sum of $144,919.40 to be paid in 120 equal monthly installments of $1,758.01 that included 8% annual interest, commencing thirty days after the effective date of the plan. About two months later, BBVA filed an "Election Under Section 1111(b)", acknowledging that: the secured portion of its claim was equal to the net cash value of the assigned life insurance policy as of July 29, 2005; the unsecured deficiency was to be treated under the Plan's Class six; and the sum of the deficiency depended on the "actual present value of the surrender value of the life insurance policy." BBVA then stated it was making the election allowed by Section 1111(b)(2) of the Code, choosing to be "treated as fully secured under section 1111(b)", and as a recourse creditor, the Bank argued the full amount of the debt must be treated as secured under the



3

plan. It also waived any right to vote as an unsecured creditor because once the election was made there was no deficiency. Finally, the Bank averred its election meant the plan must provide for deferred cash payments equal to the present value of the collateral and for retention of the lien until full payment. Consequently, BBVA argued the plan could not provide for payment of 30% of its recourse claim.

Debtor countered by stating the Bank's election entitled it to "receive payment equal to the value of the cash value of the Policy in full satisfaction of BBVA's claim against the Debtor...".

BBVA replied, stating after the election its claim could not be altered by Code sections 506(a)&(b). For purposes of confirmation, its debt should be considered fully secured, but its secured claim did not need to be treated the same as a fully secured claim. This special treatment, the Bank argues entitled the Bank to "receive the total amount of the debt plus the present value of its collateral through the stream of payments". The Bank suggested that the discount rate that would provide present value of the deferred payments should take into account the risk of receiving payment over time, a matter for the court to determine in this case.

Three months later, Debtors filed a second amended plan of reorganization. This plan also recognized BBVA's secured portion



4

of its claim, estimating it at net cash surrender value as of December, 2007, and did not alter its classification as the sole member of the plan's Class eight.  Debtors treated Class eight differently.   Now Debtors proposed payment of the policy's net cash surrender value on the effective date of the plan.[6] In its sur reply Debtor disagreed with the Bank's position. Debtor averred that the secured portion of the BBVA's claim was limited to the present value of its collateral, otherwise the Bank would obtain a windfall to the detriment of the unsecured creditors. Debtor interpreted the consequences of the election as a waiver of the deficiency converting a recourse claim to a non recourse claim, entailing a loss of the right to vote in any class other than that of its allowed claim.

During the hearing to approve the disclosure statement held on June 13th , we scheduled the matter to be heard together with confirmation of the plan, as Debtors were busy negotiating with other crucial creditors whose opposition might debunk confirmation.  Meanwhile, BBVA filed an objection to confirmation claiming the second amended plan incorrectly treated its claim given its section 1111(b) election, thereby violating the absolute priority rule.[7]

---

[6]  It is not clear whether Debtors intended to keep the collateral and continue paying the premiums due on the policy.

[7]  BBVA has not appealed our ruling concerning the absolute priority rule.

5

During the first hearing on confirmation held last July 8th, we raised the issue of the collateral's inconsequential value[8] that would defeat BBVA's section 1111(b) election, citing *In re Wandler*, 77 B.R. 728 (Bkrtcy. N.D. 1987). We granted BBVA's request for time to brief the issue, ordering the Debtor to reply, and scheduling it to be heard during the second hearing on confirmation set by agreement of the parties for July 30th.

BBVA's brief addressed the split of authorities as to the meaning of "inconsequential value". It also tried to distinguish the *Wandler* decision from the circumstances at hand. BBVA pointed out other factors showing the policy was not of inconsequential value, such as the fact the policy (a key man insurance policy) played a critical role in maintaining creditors confidence in the business. It concluded by repeating that the second amended plan's treatment of BBVA's claim after the section 1111(b) violates the absolute priority rule.

Debtor's memorandum embraces the ruling of *In re Wandler*, **stating unequivocally that it would cancel the policy on the effective date of the plan as it was not needed for Debtors' effective reorganization of the Debtor.** (Our emphasis)



We began the July 30th hearing by stating that Debtors'

---

[8] "There are two situations in which the election cannot be made. First, if the creditor's interest in the collateral 'is of inconsequential value...,' the election cannot be made." (cit. omitted) *In re Griffiths*, 27 B.R. at 875.

proposal for a **surrender** of the policy made the entire question of the election and the issue of inconsequential value moot. Debtor agreed. At that point, Counsel for BBVA argued that he believed there were cases stating that an 1111(b) election could not be defeated by a debtor's abandonment, foreclosure or sale of the collateral. We answered that a surrender was not an abandonment, foreclosure or sale. BBVA then asked the court to rule on whether it could continue paying the premiums if the policy were surrendered. The Court answered that it would depend on the terms of the assignment, the policy, and applicable non bankruptcy law; a question that we could not answer given the information produced, and our limited jurisdiction. Counsel for the Bank then asked for time to consult with his client who might accept this new treatment. We ordered the Bank to reply in 24 hours[9], which it did by, filing the instant motion for reconsideration of our bench ruling under FRBP 9024.[10]



### Discussion

Although BBVA brings its request for reconsideration under FRBP 9024 and FRCP 60(b)(6), we shall consider it under FRBP 9023

---

[9] The reasonableness of this short period was confirmed when BBVA stated during the August 4th oral argument that it agreed this short period was sufficient.

[10] Debtors were ordered to answer immediately and oral argument was set for August 4th by agreement of the parties.

and FRCP 59(e).[11] Under these Rules BBVA must clearly establish

we committed a manifest error of law when ruling that questions

concerning the life insurance policy's inconsequential value and

consequences of BBVA's election under Code § 1111(b) became moot,

when Debtors decided to relinquish the policy in addition to

paying its net cash value on the effective date of the plan, and

treating the Bank's deficiency claim under Class six.

BBVA challenges our ruling even though it accepts Debtors'

offer to surrender the policy.[12] BBVA insists it still has the

right to payment of its deficiency claim of approximately $2.8

million dollars as a secured debt under the plan due to its

previous § 1111(b) election. Citing *In re Century Glove, Inc.*,

*supra*, BBVA argues that once the election is made, Debtors may



---

[11] "Federal courts have consistently stated that a motion
... which challenges the prior judgment on the merits will be
treated as either a motion 'to alter or amend' under Rule 59(e)
or a motion for 'relief from judgment' under Rule 60(b). Which
rule applies depends essentially on the time the motion is
served. If a motion is served within ten days of rendition of
the judgment, the motion ordinarily will fall under Rule 59(e).
If the motion is served after that time, it falls under Rule
60(b)." *In re Pabón Rodríguez*, 233 B.R. 212, 218-19 (Bkrtcy.
P.R. 1999).

[12] There is an attachment to the motion for reconsideration
stating Debtor cannot cancel this assigned policy if the BBVA
does not agree to sign the surrender document; should the policy
owner discontinue the monthly premium payments, the Bank may keep
the policy in force; if the owner cannot make the monthly premium
payments, the Bank may use the accumulated value of the policy to
cover the premiums and keep the policy in force; and the actual
minimum payment is $980.00 per month that will increase every
January 28th of each following year.

8

not defeat the election by subsequently modifying the second amended plan, adding a key difference: that it would relinquish the policy through its cancellation or surrender.

It seem to us that one of the reasons why the creditor makes the § 1111(b) election is to prevent a debtor who is retaining collateral and using it for its reorganization from getting a windfall, while not paying the entire sum owed according to the initial bargain. This situation occurs when a debtor's plan proposes to bifurcate the secured claim into a secured portion, based on the court's valuation of its collateral, and an unsecured claim equal to the deficiency or recourse claim, resulting from valuation of the collateral. Retention of the collateral and its use by the reorganized debtor for purposes other than a sale before plan completion, may result in a windfall. A debtor would obtain a windfall because it paid the secured creditor less than its initial bargain under the plan, and profits by using the collateral and keeping it with its future appreciation in value. The section 1111(b) election is designed to prevent this from occurring. It calls for payment of the entire allowed claim as secured, preventing bifurcation. If the payment of the allowed claim is deferred, it must provide a discount rate to account for the present value over the sum equal to the value of the collateral.[13]  When a debtor surrenders the



---

[13] 58 Am. Bankr. L.J. 129, 136 (1984).

collateral in favor of the lienholder, the lienholder is then free to exercise its *in rem* rights in the encumbered property, which is exactly what the creditor bargained for in the event of default. Thus, Debtor's decision to relinquish the policy by surrendering it to BBVA moots its election and the question of the collateral's inconsequential value.[14]

We read *In re Century Glove, Inc*, *supra*, as allowing a debtor to treat the electing creditor differently from what the plan expressly proposes, provided the electing creditor affected by this modification or alteration of the plan is "given the opportunity to change its prior [1111(b)] election." *In re Century Glove, Inc.*, 74 B.R. at 961. The modified second amended plan does just that, it relinquishes the collateral in favor of BBVA, provides for payment of the secured portion of its claim, and allows the deficiency or recourse portion to be placed in Class six where it will be treated as a general unsecured claim with a right to 28% of approximately 2.8 million U.S. dollars. This treatment amounts to a cram down under Code section



---

[14] "Although the language of section 1111(b) does not refer specifically to abandonments, if the property is not sold [under the plan[], but is abandoned or **returned to the secured party**, the non recourse deficiency claim should disappear. The same result should occur if the creditor obtains relief from stay and forecloses prior to confirmation." (Our emphasis) 7 *Collier On Bankruptcy*, § 1111.03 [2][b][ii] (15th Ed. rev.).

10

1129(b)(2)(A)(iii).[15]

## Conclusion

In sum, Debtors may modify their second amended plan in the above stated manner, and such modification effectively moots BBVA's prior § 1111(b) election, as well as the issue concerning the inconsequential value of its collateral. Therefore, we deny the motion for reconsideration as the Bank has not demonstrated we committed a clear error of law when ruling from the Bench on this matter.

**SO ORDERED**, in San Juan, Puerto Rico on August 13, 2008.

SARA DE JESUS
U.S. Bankruptcy Judge

,

---

[15] "The debtors chose the third option of giving ... [BBVA] 'the indubitable equivalent of such claim ...' 11 U.S.C. § 1129(b)(2)(A)(iii). The phrase 'indubitable equivalent' is derived from Judge Lerned Hand's opinion in *In re Murel Holding Corp.* [cit. omitted]. It includes 'abandonment of collateral' to the secured creditor. [cit. omitted] Indubitable equivalent cash payments must equal at least the secured claim." *In re Griffiths*, 27 B.R. at 876.